UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
HANNAH V. WATSON,                    :    08 Civ. 1523 (DAB)(JCF)
                                     :
                   Plaintiff,        :        REPORT AND
                                     :     RECOMMENDATION
     - against -                     :
                                     :
MICHAEL J. ASTRUE,                   :
Commissioner of Social Security,     :
                                     :
                   Defendant.        :
- - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE DEBORAH A. BATTS, U.S.D.J.:

     The plaintiff, Hannah Watson, brings this action pursuant to
section 405(g) of the Social Security Act (the "Act"), 42 U.S.C. §
405(g), seeking review of a determination of the Commissioner of
Social Security (the "Commissioner") finding that she is not
entitled to disability insurance benefits ("DIB") or Supplemental
Security Income ("SSI") benefits.  The parties have both submitted
cross-motions for judgment on the pleadings under Rule 12(c) of the
Federal Rules of Civil Procedure.  Specifically, the plaintiff
alleges a variety of reasons that she did not receive a full and
fair hearing before the Administrative Law Judge (the "ALJ") and is
therefore entitled to an order remanding the matter to the
Commissioner for further proceedings. For the reasons set forth
below, I recommend that the plaintiff's cross-motion be denied, the
Commissioner's cross-motion be granted, and judgment be granted in
favor of the Commissioner.

1

Background

    A.   Procedural History

    In late 2005, Ms. Watson applied for DIB and SSI benefits, alleging that she was unable to work due to pain in her lower back, right knee, and elbows.  (R. at 40-46, 239-49, 282).[1]  She claimed that she had become unable to lift or carry objects or walk for long periods of time.  (R. at 41).  Ms. Watson also complained of numbness in the fingers of both hands.  (R. at 40).  Ms. Watson's injuries stemmed from an accident she sustained at work in October 2004.  (R. at 100, 102, 274).

    The Social Security Administration (the "SSA") denied Ms. Watson's application on March 30, 2006.  (R. at 31-36).  Based on the medical evidence, the SSA found that Ms. Watson's condition was not so severe as to completely prevent her from working.  (R. at 35, 36).  Shortly thereafter, the plaintiff requested a hearing before an administrative law judge (an "ALJ"). (R. at 29-30).  On June 26, 2007, the plaintiff and her attorney appeared at a hearing before ALJ Robin J. Arzt.  (R. at 267-90).

    In a decision dated July 27, 2007, the ALJ found that Ms. Watson was not disabled under the Act and therefore was not entitled to benefits.  (R. at 12-19).  The ALJ's decision became

---

[1] "R." refers to the Administrative Record filed with the Commissioner's answer.

the final decision of the Commissioner on December 21, 2007 when the Appeals Council denied Ms. Watson's request for review.  (R. at 4-6).  The plaintiff then filed the instant complaint.

B.   Personal History

Ms. Watson was born on August 7, 1953. (R. at 47, 272).  She obtained her general equivalency diploma in 1996 (R. at 45, 273), and has held several full-time jobs since.  (R. at 41, 50-55, 278-82).  In 1997, Ms. Watson worked temporarily as an administrative assistant for a transportation company.  (R. at 41, 281-82).  After that, from 1998 to 2000, she held two jobs as a retail sales associate.   (R. at 41, 281).   Ms. Watson then worked at a consulting firm as an administrative assistant for a year, from May 2001 until May 2002.  (R. at 41, 278).   In this position, she worked primarily from a desk, interviewing prospective employees to determine the employees' eligibility for certain tax credits.  (R. at 53, 279-80).  Her job also entailed basic clerical duties such as typing, faxing, filing, and answering telephones.  (R. at 279-80).  Although she occasionally had to carry boxes of paper to refill a copying machine, it appears that she generally did not have to lift more than ten pounds.  (R. at 53, 280).  For some period after this job ended, Ms. Watson performed maintenance work for the New York City Parks and Recreation Department.  (R. at 52).

Ms. Watson's most recent job, which she held for over two

3

years, was as a caretaker for a building owned by the New York City Housing Authority. (R. at 41, 51, 273-74). In this position, she performed duties typical of an apartment building superintendent: she regularly cleaned the building's elevator and lobby, she took garbage out to the dumpsters, and she generally policed the building. (R. at 51, 273). Ms. Watson fell at work on October 19, 2004, injuring her lower back, right knee, both elbows and three fingers on her right hand. (R. at 100, 102, 274).

> C. Medical History

Ms. Watson had an x-ray of her spine the day after her fall, but there was no evidence of any fractures or dislocation. (R. at 72). In January 2005, Ms. Watson began regular treatment with Dr. Richard Memoli for the injuries she sustained during her accident. (R. at 86-95). Dr. Memoli recommended that Ms. Watson start physical therapy and take pain medication. (R. at 95). After examinations in February, April, and May of 2005, Dr. Memoli found that Ms. Watson's complaints and her physical symptoms were unchanged. (R. at 92-94). She continued to complain of pain in her lower back and knees and tenderness in her elbows; Dr. Memoli noted swelling, buckling, and restricted motion in her right knee and restricted motion and spasm in her spine. (R. at 92-94).

On August 11, 2005, Dr. Kenneth Seslowe examined Ms. Watson in connection with her application for Worker's Compensation benefits.

(R. at 120-22).   Although he verified that Ms. Watson had "sustained contusions of her left elbow, right knee and right hand" and sprained her spine when she fell, he also concluded that she had reached "maximum medical improvement," needed no further treatment, and was currently working.  (R. at 121).

On October 3, 2005, Ms. Watson returned to Dr. Memoli with complaints of increased pain and muscle spasm in her lower back and of persistent pain in her right knee.  (R. at 90).  He noted tenderness, swelling, buckling, and restricted movement in her knee, tenderness in her spine, and tenderness in her elbows.  (R. at 90).   He prescribed physical therapy, continuation of medication, and a tennis elbow band.  (R. at 90).  Finding that she was "totally disabled" for her regular occupation, Dr. Memoli advised Ms. Watson to stop her current job because it involved "lifting and walking and carrying heavy objects." (R. at 90, 119). Following this examination, Ms. Watson received a magnetic resonance imaging scan ("MRI") of her right knee.  (R. at 251).  It indicated that she had a small tear of the medial meniscus,[2] a ligament sprain, joint effusion, and moderate osteoarthritis.  (R. at 251).

---

[2] The "medial meniscus" is a "crescent-shaped intraarticular cartilage of the knee joint." Stedmans Medical Dictionary, 246,610 (27th ed. 2000).

Ms. Watson returned to Dr. Seslowe in January 2006 for another examination in connection with her Worker's Compensation benefits. (R. at 114-16).  He noted that Ms. Watson claimed that "everything has gotten worse," specifically, that pain in her right knee, right elbow, and back had increased and that her fingers bothered her more.  (R. at 114).  His examination, however, yielded generally negative findings.  Dr. Seslowe observed that Ms. Watson walked without a limp, had "full lateral bend and extension" of her back, normal reflexes, stability in her knee, "excellent strength and stability" generally as well as an "excellent power grasp," and normal sensation.  (R. at 114-15).  He concluded that the sprain in her back and the contusion of her right knee were resolved, and that the contusions to her left elbows and fingers were resolving. (R. at 115).  Again, he opined that she needed no further treatment, was not disabled, and could return to work.  (R. at 115).  A radiograph of Ms. Watson's spine following this examination showed "normal alignment," "no evidence for fracture," "no evidence for spondylolisthesis,"[3] and no issue with the soft tissue of her vertebrae; in sum, the results were unremarkable.

---

[3] "Spondylolisthesis" or "spondyloptosis" refers to "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum."  Stedmans Medical Dictionary, 382,020 (27th ed. 2000).

(R. at 79).

    Dr. Steven Calvino, a consultative examiner, saw Ms. Watson
the next month, in February 2006.  (R. at 127-30).  He reported
that Ms. Watson complained of severe pain in her elbows, lower
back, and right knee.  (R. at 127).  Dr. Calvino also noted,
however, that the plaintiff claimed to be able to cook, clean, do
laundry, dress herself, and shop as needed.  (R. at 128).  He found
that she "appeared to be in no acute distress" and could stand up
and walk without difficulty.  (R. at 128).  Dr. Calvino examined
Ms. Watson's spine and upper and lower extremities and determined
that she had right knee pain, mechanical low back pain, rotator
cuff tendinitis in her left shoulder, and arthritic knees.  (R. at
129).  Overall, however, Ms. Watson's prognosis was good.  (R. at
129).  Dr. Calvino concluded that she was mildly limited in her
ability to perform heavy lifting, frequent bending, or squatting,
and moderately restricted in her ability to  perform repetitive
overhead activity.  (R. at 130).  He opined that she was not
restricted in her ability to sit or perform fine motor activities.
(R. at 130).

    Ms. Watson returned to Dr. Memoli in March and April of 2006.
(R. at 86, 87).  He reported "persistent complaints and positive
physical findings" of the type previously noted.  (R. at 86, 87).
He affirmed his opinion that Ms. Watson was "presently totally

7

disabled for her regular occupation" as a housing caretaker.  (R. at 86, 87).

On April 26, 2006, Ms. Watson was admitted to New York Presbyterian Hospital for complaints of chest pain radiating through her left arm.  (R. at 146).  She was diagnosed with two-vessel coronary artery disease and a myocardial infarction (commonly called a heart attack).  (R. at 146).  Ms. Watson was fully treated for her heart disease; she had a catheter placed in her middle left anterior descending artery, underwent a thrombectomy to remove the blood clot in her right circumflex artery, and had an angioplasty with stents to correct the obstructed arteries.  (R. at 147, 171-72, 175-76).  She was discharged on May 1, 2006. (R. at 147).

Ms. Watson was seen by Dr. Vishwas Singh for follow-up cardiac treatment.  (R. at 139-45).  Although her cardiovascular examination showed no abnormalities (R. at 140), Dr. Singh noted that Ms. Watson should stop smoking and obtain counseling to treat her obesity (R. at 145).  Ms. Watson was directed to refrain from lifting objects weighing more than ten to fifteen pounds, pushing or pulling heavy objects, or performing heavy housework for a few weeks.  (R. at 199).  She was also referred to a Dr. Feldman for further cardiac care and, subsequently, for cardiac rehabilitation. (R. at 141).

Ms. Watson continued her treatment with Dr. Memoli, visiting him in June, August, September, November, and December of 2006 and in March and May of 2007.  (R. at 252-58).  On all of these dates, Dr. Memoli reported identical observations; namely, that Ms. Watson (1) consistently complained of marked and increasing pain in her back and of persistent pain in her knee, (2) had certain restrictions of motion, muscle spasms, swelling, and buckling of her right knee, (3) had tenderness in both elbows, and (4) had restricted motion in her left shoulder.  (R. at 252-58).  Dr. Memoli recommended that Ms. Watson continue general care, use a tennis elbow band, undergo physical therapy, and take pain medication.  (R. at 252-58).  In May 2007, he also prescribed a corset for her back.  (R. at 252).  Dr. Memoli consistently classified Ms. Watson as "presently totally disabled for her regular occupation" as a housing caretaker.  (R. at 252-58).

On November 29, 2006, Ms. Watson was examined by the New York City Human Resources Administration ("HRA") in connection with her Family Assistance benefits.  (R. at 203-20).  Dr. Nnaemezie Umeasor, from Bronx Lebanon Hospital, was the examining physician. (R. at 203-20).  According to Dr. Umeasor, Ms. Watson suffered from a variety of "morbid health issues," including her recent heart problems, symptoms of depression, obesity, and diabetes, and "multiple arthritic symptoms." (R. at 215).  Indeed, Ms. Watson's

symptoms of depression were so pronounced that Dr. Umeasor opined that Ms. Watson "clearly cannot function at this point due to her mental incapacity." (R. at 215). Accordingly, Dr. Umeasor recommended further psychiatric treatment. (R. at 214, 215).

On June 1, 2007, Dr. Memoli completed a physical capacities evaluation. (R. at 265). He indicated that Ms. Watson was unable to sit, stand, or walk for longer than two hours during an eight-hour work day. (R. at 265). He also reported that Ms. Watson could occasionally lift or carry up to five pounds, but never more than that. (R. at 265). In his opinion, Ms. Watson was not able to use her hands repetitively to grasp, pull, push, or manipulate objects, nor could she use her feet for repetitive movements. (R. at 265). Finally, Dr. Memoli reported that Ms. Watson had no ability to bend, squat, crawl, climb, or reach. (R. at 265). In sum, he concluded, Ms. Watson was "presently totally disabled" because she "cannot perform any duties of her job." (R. at 265).

D.   Hearing Testimony

During her hearing, Ms. Watson testified that she had to stop working in October 2005 because the pain in her knee and back had become "unbearable." (R. at 282). She also testified that she experienced a reoccurrence of heart pain two months before the hearing and had gone to the doctor but that no further procedures were currently planned. (R. at 285-86). Ms. Watson explained that

she took several medications related to her heart disease, but did
not take any pain medication for her back and knee because she
feared that it would negatively interact with her other
medications. (R. at 286). She claimed that she could walk and
stand for only limited amounts of time, which she attributed
primarily to her back issues. (R. at 286-87). She also testified
that she could not bend down to pick up an item off the floor and
that she experienced pain in her back if she sat still for too
long. (R. at 287). Although she claimed some difficulties in
doing so, Ms. Watson indicated that she could still dress herself,
use public transportation, and assist with household chores like
cooking. (R. at 288-89). In addition, although she experienced
frequent numbness  in her fingers, Ms. Watson did not allege any
problems with using her hands other than that her handwriting had
become sloppy. (R. at 287).

Discussion

    A.   Standard of Review

The scope of review of a social security disability
determination involves two levels of inquiry. First, the court
reviews the Commissioner's decision to determine whether the
Commissioner applied the correct legal standard. Tejada v. Apfel,
167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75,
79 (2d Cir. 1998). Second, the court must determine whether the

11

Commissioner's decision was supported by substantial evidence. Tejada, 167 F.3d at 773; Balsamo, 142 F.3d at 79.  In this context substantial evidence is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229 (1938)).  If substantial evidence supports the Commissioner's decision, then it must be upheld, even if substantial evidence also supports the contrary result.  Ventura v. Barnhart, No. 04 Civ. 9018, 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.")).

     "Before deciding if the Commissioner's determination is supported by substantial evidence, however, the Court must first conclude that the applicant received a 'full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act.'"  Thompson v. Astrue, No. 07 Civ. 07793, 2008 WL 4613750, at *8 (S.D.N.Y. Oct. 16, 2008) (quoting Echevarria v. Secretary of Health & Human Services, 685 F.2d 751, 755 (2d Cir. 1982)).  In the Second Circuit, it is well established that

          [T]he ALJ, unlike a judge in a trial, must herself

> affirmatively develop the record in light of the
> essentially non-adversarial nature of a benefits
> proceeding.  This duty arises from the Commissioner's
> regulatory obligations to develop a complete medical
> record before making a disability determination and
> exists even when, as here, the claimant is represented by
> counsel.

Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (quotation marks
and citations omitted).  If the reviewing court determines that a
claimant did not receive a "fair and adequate hearing" before the
ALJ, Echevarria, 685 F.2d at 755, it must remand the case to the
Commissioner "even if the Commissioner's decision was supported by
substantial evidence."  Thompson, 2008 WL 4613750, at *8 (citing
Morgan v. United States, 304 U.S. 1, 15 (1938); Echevarria, 685
F.2d at 755; Hankerson v. Harris, 636 F.2d 893, 896 (2d Cir.
1980)).

    B.   Evaluation of Disability Claims

    A claimant is disabled under the Act and therefore entitled to
benefits if she can demonstrate that she is unable "to engage in
any substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less than 12 months."  42 U.S.C. §
423(d)(1)(A).  The disability must be of "such severity that [the
claimant] is not only unable to do [her] previous work but cannot,

considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether an individual is entitled to disability benefits, the Commissioner employs a five-step sequential analysis. 20 C.F.R. § 404.1520; Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 1999).  First, the claimant must demonstrate that she is not currently engaged in a substantial gainful activity.  20 C.F.R. § 404.1520(b).  Next, the claimant must prove that she has a severe impairment that "significantly limits [her] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c). Third, if the impairment is listed in 20 C.F.R. § 404, Subpt. P, App. 1, or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled. 20 C.F.R. § 404.1520(d).  However, if the claimant's impairment is neither listed nor equal to any listed impairment, she must prove that she does not have the residual functional capacity to perform her past work, defined as substantial gainful activity performed within the past 15 years.  20 C.F.R. §§ 404.1520(e) & (f), 404.1560(b)(1). Finally, if the claimant satisfies her burden of proof on the first four steps, the burden shifts to the Commissioner to show that there is alternative substantial gainful employment in the national economy that the claimant can perform.  20 C.F.R. § 404.1520(g);

14

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000).  In making a determination of disability, the Commissioner must consider four factors: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v. Hekler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

C.   ALJ's Decision

In the instant case, the ALJ determined at step one of the disability inquiry that Ms. Watson had not been engaged in substantial gainful activity since October 2005.  (R. at 14).  At step two, she found that Ms. Watson had the following severe combination of impairments: a right knee disorder, a lower back disorder, a left shoulder disorder, and non-insulin dependant diabetes.  (R. at 14).  The ALJ noted that Ms. Watson had no residual chest pain or discomfort and that her right hand disorder was "not medically determinable."  (R. at 14).  At the next analytical step, after concluding that none of Ms. Watson's impairments nor any combination of them substantially equaled any listed impairment, the ALJ proceeded to assess whether Ms. Watson retained the residual functional capacity to perform her past work.

15

(R. at 14-18).

    After reviewing the medical evidence on the record (R. at 14-18), the ALJ found that although Ms. Watson's impairments "could reasonably be expected to produce the alleged symptoms. . . [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. at 16). She also noted that Ms. Watson "walked into and out of the hearing room with a normal gait and without an assistive device" even though she declined to take pain medication. (R. at 16). Although the ALJ agreed that Ms. Watson had substantial impairments, she concluded that Ms. Watson was occasionally capable of lifting and carrying up to ten pounds, pushing and pulling light objects, and bending. (R. at 14). The ALJ also determined that, in an eight-hour work day, Ms. Watson could walk or stand upright for up to two hours and sit for up to six hours, but could not reach or work overhead with her left arm. (R. at 14). For these reasons, the ALJ found that Ms. Watson retained the residual functional capacity to perform a wide range of sedentary work.[4]   (R. at 14).

---

    [4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

16

Accordingly, Ms. Watson was deemed able to perform her past relevant work as an administrative assistant, but not her past relevant work as a caretaker or retail salesperson. (R. at 18).

In reaching this conclusion, the ALJ declined to give controlling weight to the conclusions of Dr. Memoli, Ms. Watson's treating physician. (R. at 17-18). Although the ALJ agreed with Dr. Memoli's opinion that Ms. Watson was incapable of performing her job as a caretaker, she disagreed with his June 2007 assessment to the extent he had found Ms. Watson to be wholly incapacitated and unable to perform any job. The ALJ explained that Dr. Memoli's findings were inconsistent with his prescribed treatment and were refuted by the findings of several other physicians. (R. at 17-18). The ALJ also noted that Dr. Memoli focused his attention on Ms. Watson's knee, repeatedly opining that it was unstable, but that this finding was inconsistent with Ms. Watson's own testimony, the MRI, and the reports of other examining physicians. (R. at 17).

D. <u>Full and Fair Hearing</u>

In her motion seeking reversal of the Commissioner's decision, the plaintiff argues primarily that Ms. Watson was not afforded a full and fair hearing by the ALJ and is therefore entitled to a remand. (Memorandum of Law in Support of Plaintiff's Cross-Motion

for Judgement on the Pleadings and in Opposition to Defendant's Motion for Judgement on the Pleadings ("Pl. Memo.") at 1, 11-21). The plaintiff complains specifically that the ALJ (1) failed to fully develop the medical record with regard to Ms. Watson's cardiac impairments; (2) neglected to inform Ms. Watson of steps she could take to bolster evidence of her disability; (3) ignored how Ms. Watson's obesity exacerbated her musculoskeletal and cardiac impairments; and (4) did not consider all relevant requirements of Ms. Watson's past work in assessing whether she retains the residual functional capacity to perform her past work. (Pl. Memo. at 11-21).  None of these objections has merit.

It is clear from the hearing transcript that the ALJ fulfilled her duty to fairly develop the medical record.  She accepted additional exhibits from Ms. Watson's attorney (R. at 269-70), asked if there was anything else to add (R. at 271), and stated clearly that, if nothing further was proffered, she would consider the record to be complete.  (R. at 271).  The ALJ also asked several questions about Ms. Watson's cardiac issues specifically, including whether the plaintiff's difficulties with walking stemmed primarily from problems with her heart or her back.  (R. at 286). Ms. Watson testified that, although sometimes her cardiac impairments affected her ability to walk, her main problems were with her back.  (R. at 286).  This response was consistent with Ms.

18

Watson's attorney's earlier affirmation that the primary ongoing concern was Ms. Watson's orthopedic issues, not her cardiac ones. (R. at 276).

Moreover, the plaintiff does not identify any additional evidence that would have likely changed the ALJ's analysis of the severity of Ms. Watson's overall condition.  Given the apparent completeness of the record in this case, without an allegation of specific evidence that would have altered the ALJ's ultimate conclusion there is no reason to believe that the ALJ failed to develop an adequate record.

The plaintiff also faults the ALJ for neglecting to "assess the severity of Ms. Watson's obesity [or] the effect of obesity in combination with Ms. Watson's other severe impairments."  (Pl. Memo. at 18).  The plaintiff does not allege, however, that obesity is an independent ground upon which Ms. Waton could be found to be disabled.  As the effects of Ms. Watson's obesity were necessarily factored into each physician's general evaluation of Ms. Watson's cardiac and orthopedic impairments, the ALJ had no reason to address Ms. Watson's obesity explicitly.  To be sure, Ms. Watson's subjective experience of pain may be hightened by her obesity (Pl. Memo. at 17-18); however, the ALJ had several reasons to find Ms. Watson's description of her pain to be incredible.  For example,

the ALJ placed weight on Ms. Watson's testimony that, notwithstanding her pain, she does not take pain medication. (R. at 16, 286). Furthermore, the ALJ observed Ms. Watson walk normally and sit through the hearing without visible distress, observations that accord with other evidence in the medical record.[5] (R. at 17).

Finally, the ALJ properly compared Ms. Watson's residual functional capacity to the requirements of her past relevant work as actually performed by her and as performed generally in the national economy. Ms. Watson testified that, as an administrative assistant, she sat at a desk for most of the day. (R. at 53, 278-80). Her testimony indicated that her position required only occasional and insubstantial physical exertion. (R. at 53, 278-80). As noted by the ALJ (R. at 18), Ms. Watson's description of this position comports with the definition of "administrative assistant" in the Dictionary of Occupational Titles (the "DOT"). Department of Labor, Dictionary of Occupational Titles No. 169.167-010 (4th ed. 1991). The DOT classifies the position of administrative assistant as sedentary work, requiring the exertion of "up to ten pounds of force occasionally . . . and/or a

---

[5] An ALJ may consider her own observations when assessing a claimant's credibility. Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998).

negligible amount of force frequently . . . to lift, carry, push, pull, or otherwise move objects." Id.  It goes on to describe sedentary work as involving mainly sitting, "but may involve walking or standing for brief periods of time" and "only occasionally." Id.  Even though Ms. Watson is unable to reach overhead, she retains the capability to generally perform the physical duties required of an administrative assistant, namely sitting for most of the work day and using her hands.

In sum, Ms. Watson was afforded a full and fair hearing and the ALJ made her decision based upon a reasonably complete medical record.  Moreover, substantial evidence in the record supported the ALJ's determination that the plaintiff had the residual functional capacity to perform sedentary work, including her past relevant work as an administrative assistant.  Accordingly, the Court must defer to the Commissioner's judgement. Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990).

Conclusion

For the reasons set forth above, I recommend that the plaintiff's motion for judgment on the pleadings be denied, the defendant's motion be granted, and judgment be entered dismissing the complaint.  Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties

shall have ten (10) days from this date to file written objections

to this Report and Recommendation.  Such objections shall be filed

with the Clerk of the Court, with extra copies delivered to the

chambers of the Honorable Deborah A. Batts, Room 2510, and to the

chambers of the undersigned, Room 1960, 500 Pearl Street, New York,

New York 10007.  Failure to file timely objections will preclude

appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          February 4, 2009

Copies mailed this date to:

Ruth Axelrod, Esq.
Axelrod and Gottlieb
100 Lafayette Street, Suite 304
New York, New York 10013

Susan C. Branagan, Esq.
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007

22